FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JUL 29 PM 4:11

U.S. DISTRICT COURT
N.D. OF ALABAMA

LARRY W. DEAN, )
 )
   Plaintiff, )
 )
-vs.- ) CV-98-P-0619-S
 )
BOARD OF TRUSTEES OF THE )
UNIVERSITY OF ALABAMA SYSTEM, )
for its division, UNIVERSITY OF ALABAMA )
HOSPITAL, and KEVIN LOFTON, )
 )
   Defendants. )

**ENTERED**

**JUL 3 0 1999**

## MEMORANDUM OPINION

The defendants filed their summary judgment motion in this reverse race discrimination case on April 1, 1999. The motion was taken under submission on June 14, 1999, without oral argument. After careful consideration, the court finds that the defendants' motion for summary judgment is due to be granted.

### Facts

The plaintiff, Larry Dean, was hired as a nurse manager at the University of Alabama at Birmingham Hospital[1] in 1989. Over the years, Dean was given more management responsibility, eventually becoming the nurse manager over the Medical Intensive Care Unit, the Surgical Intensive Unit, the Respiratory Care Unit, and the Telemetry Unit. In 1996, Dean received a ten per cent pay

---

[1]The University of Alabama at Birmingham is a division of the Board of Trustees of the University of Alabama. The University Hospital is a department of UAB.

1



raise as a result of taking on the additional management duties.[2]

On April 24, 1997, Dean drafted a memo to his staff to alert them to a problem with accounting for narcotics in the medical intensive care unit. By law, the nurses were required to account for all narcotics taken out of the narcotics cabinet at the end of each shift. However, nurses were apparently taking narcotics without recording this information in the Control Drug Administration Record ("CDAR"). In the memo, Dean used the word "Buckwheat" as a fictitious name as part of his explanation for the proper procedure for recording the narcotics in the CDAR. Prior to posting the memo, however, Dean read the memo to Alma Hayes, a black female nurse who happened to be standing nearby, and asked her if the "Buckwheat" reference offended her because she was black. When Hayes responded by saying "No" and "Don't be silly," Dean asked if she thought anyone else would have a problem with the use of the term. Once again, Hayes responded by saying "No." Dean then posted the memo in two locations within the unit.

Shortly after Dean posted the memo, a black nurse, Martha Peoples, commented to Hayes that she was offended by the use of the word "Buckwheat." Hayes then asked the only other black nurse on duty at the time if she found the term racially offensive, to which the nurse replied "Not really, but I just didn't like it." As a result of these conversations, Hayes scratched out the word "Buckwheat" and replaced it with the word "Buddy."[3]

---

[2] In an interoffice memo, which Dean did not see until his deposition, the hospital's Compensation Manager wrote:
> Based on the additional responsibilities that Mr. Dean has acquired, we recommend a 10% increase in his base salary. If the scope of Mr. Dean's duties are reduced then the 10% increase should be taken away

[3] Apparently, three black nurses filed EEOC complaints alleging racial discrimination as a result of the use of the term "Buckwheat," although there is no evidence that any of the nurses actually saw the memo.

2

A few days later, Dean's immediate supervisor, Mari Ellen Sharp, called Dean into her office and informed him that several people were upset by the "Buckwheat" memo. Dean then wrote an apologetic memo to the unit, stating that is was not his intent to offend anyone. During the next few days, both Sharp and Dean met with various people concerning the memo, including Kevin Lofton, the hospital CEO and the only individual defendant in this case. A final determination was made to transfer Dean to a non-management position in the Nursing Staff Development Department.[4] According to Lofton,[5] Dean's use of the term "Buckwheat" in a staff memo indicated a lack of judgment that was unacceptable for a manager.

Dean used the internal grievance process to challenge the disciplinary action.[6] After the grievance committee upheld the discipline, Dean filed a reverse discrimination claim with the EEOC and received a right to sue letter. Dean subsequently filed this action, asserting employment discrimination and constructive discharge claims under Title VII, § 1983 and the Equal Protection Clause of the Fourteenth Amendment.[7]

---

[4] Dean's pay was reduced by 10% in addition to the transfer. However, it is undisputed that Kevin Lofton did not know that Dean's salary would be reduced as a result of the transfer prior to initiating the transfer. Interestingly, Dean was transferred into a position in which he became responsible for conducting management training.

[5] Lofton is Dean's supervisor and is a black male.

[6] The grievance committee, comprised of three UAB employees, heard testimony and ultimately concluded that the disciplinary action against Dean was "too harsh." The committee further recommended that Dean be given "bridge pay" and be required to attend diversity training. However, both the Vice-President for Human Resource Management and the President of UAB upheld Lofton's decision to transfer Dean to a non-management position, thereby reducing his pay by 10%.

[7] Dean's complaint includes a claim for demotion and constructive discharge against the Board of Trustees and former CEO of the UAB Hospital, Kevin Lofton.

Analysis

I. Race Discrimination Claim

In order to establish his prima facie case of race discrimination, Dean must show that (1) he is a member of a protected class, (2) he engaged in conduct similar to that of a person outside the protected class, and (3) the discipline imposed on him was more severe than that imposed on the persons outside the protected class. See Jones v. Gerwens, 874 F.2d 1534, 1540 (11th Cir. 1989).[8] Alternatively, because this is a violation of a work rule case, Dean may show that he did not violate the work rule, in lieu of the second and third elements above. Id. Under either method, the court finds that the defendants' summary judgment motion is due to be granted.

As to the first method, Dean contends that black employees were not treated as harshly as white employees after committing similar "lack of judgment" or "poor management" violations. In comparison with other employees whose conduct resulted in demotions, Dean points out that unlike all of the potential comparators, he did not receive written notification of the policy violated, the reasons for the discipline, and guidelines for future behavior. Furthermore, Dean contends that several black employees received written warnings and reprimands rather than instant demotion or termination for such conduct as sexual harassment and poor management practices. Although Dean states that "[n]either Lofton, Nash, Sharp, nor any other member of management at the University of Alabama Hospital in June, 1997, followed UAB policy concerning communication with an employee (Dean) about the misconduct or behavioral problems," the evidence shows that UAB's disciplinary policy allows for a wide range of actions, ranging from verbal warnings to termination.

---

[8] Because there is no direct evidence of discrimination, the claims are analyzed under the burden-shifting McDonnell Douglas/Burdine model.

4

Although the Human Resources Department may make recommendations, a decision as to what type of discipline is necessary is left to the department.[9]

There are several problems with Dean's arguments and evidence. First, from the evidence produced, it appears that the persons he claims received less harsh treatment were supervised by different supervisors and, with the exception of one person, apparently did not work in Dean's department.[10] Second, although Dean argues that his black supervisor (Lofton) did not follow university "policy" in demoting him without first providing him with a written reprimand, he has not provided evidence of a "policy" which requires such a written reprimand.

As to the second method of presenting a prima facie case of discrimination, Dean contends that he did not violate any "work rule." According to Dean, he has been an exemplary employee and did not know that the word "Buckwheat" was a racial epithet or derogatory term. While this may be true, Dean admits to writing the memo that contained the "Buckwheat" reference and acknowledges that three black female nurses complained about race discrimination to both UAB and the EEOC as a result of the memo. Clearly, the defendants had not only a legitimate reason but also an obligation to investigate the matter. The fact that Dean claims that he did not intend to offend anyone by using "Buckwheat" as a fictional character in his memo does not support his contention that he did not violate a work rule. As such, Dean's attempt to establish a prima facie case under the

---

[9]Although HR Director Connie Pruett describes UAB's disciplinary policy as "progressive," she testified that it is not unusual for disciplinary actions to be taken without first engaging in written counseling/documentation. According to Pruett, both verbal and written reprimands are often given, but are not necessarily required as a first step.

[10]Indeed, Dean has produced several "examples" of disciplinary actions that appear less harsh than the treatment he received. However, without introducing more evidence as to the race of the employee and supervisor, as well as which department the disciplined employee worked (in order to show substantial similarity with Dean), Dean is left with an empty case.

second method must fail.

However, even assuming that Dean has presented a prima facie case of discrimination, the defendants have produced legitimate, non-discriminatory reasons for their actions. Because of the verbal and written complaints to both UAB management and the EEOC concerning the memo, Lofton and other managers (some of whom are white) determined that demotion was the most suitable punishment for Dean's actions. Additionally, white manager Mary Nash agreed with Lofton's findings that the term "Buckwheat" was "potentially offensive and should not have been used in the exercise of managerial duties." Most notably, the Associate VP for Human Resources did independent research to determine if the sanctions imposed were proper and agreed with Lofton's decision to demote the plaintiff.

With regard to the 10% reduction in Dean's pay, the defendants have shown that Dean's pay was reduced because the additional duties that necessitated the 10% raise during his tenure as nurse manager were no longer required of him upon his transfer to the Nursing Staff Development Department. The 10% raise that he previously received was "[b]ased on the additional responsibilities that Mr. Dean has acquired" and was to be taken away '[i]f the scope of Mr. Dean's duties are reduced." Clearly, a disciplinary transfer to an entirely different department not only reduced, but completely ended Dean's duties as nurse manager. The defendants have produced a legitimate, non-discriminatory reason for the reduction in pay.[11]

The inquiry does not end here, however, under the McDonnell Douglas analysis. Dean may

---

[11]Additionally, in his deposition, Dean acknowledges that the transfer, without the 10% reduction in pay, would have been within the management's prerogatives and would not have constituted discipline. Dean's theory is that the transfer, in conjunction with the reduction in pay, resulted in excessive discipline.

6

survive summary judgment by presenting evidence of pretext in response to the defendants' legitimate reasons. In this case, Dean has not met his burden of establishing pretext. Although Dean attempts to show pretext by citing to the discipline/non-discipline of several other employees after potential instances of misconduct, he fails to provide sufficient evidence to allow his case to proceed to a jury. Indeed, Dean mentions an incident in which the white CFO of the Hospital told a potentially offensive gender-related joke during a speech and was allowed to remain in his management position. However, evidence concerning the CFO does not support Dean's case because the CFO's "supervisor" (the executive director) is white and is not the same supervisor who disciplined Dean. Similarly, Dean points to certain other employees that he claims received preferential treatment because of their race. However, Dean does not support this circumstantial evidence by providing evidence of the race of the employees, supervisors, departments in which the employees worked, their prior work record, their position as management or non-management, etc. that is necessary in order to show pretext. Plain and simply, Dean has not presented evidence to show that there is a genuine issue of material fact that would allow a reasonable jury to find in his favor on his race discrimination claim. The defendants' motion for summary judgment is due to be granted.

## II. Constructive Discharge

A constructive discharge occurs when an employer makes an employee's working conditions so intolerable that a reasonable person in his position would have been forced to resign. See Thomas V. Dillard Dep't Stores, 116 F.3d 1432, 1433-34 (11th Cir. 1997). In order to support a finding of constructive discharge, the plaintiff must show more than ordinary discrimination. He must show also that because of his protected status, there were aggravating factors that made the work conditions unbearable to a reasonable person. See Steele v. Offshore Shipbuilding, 867 F.2d 1311 (11th Cir.

7

1989).

Here, although Dean voluntarily resigned, he contends that he was constructively discharged as a result of the transfer and reduction in pay. In his testimony concerning the circumstances surrounding his resignation, Dean states that his supervisor instructed him to stay away from certain areas of the hospital. Dean also refers to humiliation caused by the demotion and claims that the defendants acted on anonymous complaints made about him after the transfer.

In this case, no reasonable juror could find, based on the evidence, that Dean was forced to resign as result of his transfer/demotion. Even when viewing the evidence in the light most favorable to Dean, there is simply no evidence that his working conditions were intolerable. Because the court finds that Dean has not presented a prima facie case of constructive discharge, the defendants' summary judgment motion is due to be granted as to this claim.

## Conclusion

For the reasons expressed above, the defendants' motion for summary judgment is due to be granted in full.

Date: July 29, 1999.

Chief Judge Sam C. Pointer, Jr.

Service List:
  Larry W. Dean
  Lisa Huggins